1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARIO WILLIAMS,

11              Plaintiff,                    No. 2:11-cv-0638 GEB KJN P

12        vs.

13   JASON T. HUFFMAN, M.D.,[1] et al.,       ORDER AND

14              Defendants,                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction

17              Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to

18   42 U.S.C. § 1983.  This case is proceeding on the first amended complaint, filed April 29, 2011.

19   Plaintiff alleges that defendants Dr. Traquina, L. Austin, and L. Mefford were deliberately

20   indifferent to plaintiff's serious medical needs by delaying the scheduling of plaintiff's back

21   surgery.  On June 7, 2012, plaintiff filed a motion for summary judgment.  On June 27, 2012,

22   defendants filed a motion for summary judgment.  As explained below, the court recommends

23   that defendants' motion for summary judgment be granted, and plaintiff's motion be denied.

24   ////

25   _____

26        [1]  Defendant Huffman was voluntarily dismissed by plaintiff.  (Dkt. Nos. 66, 67.)

1

II.  Plaintiff's Allegations

Plaintiff is proceeding on the verified amended complaint filed April 29, 2011, alleging that defendants were deliberately indifferent to plaintiff's serious medical needs by delaying the scheduling of plaintiff's back surgery.  (Dkt. No. 8.)  Plaintiff alleges the following:

On January 27, 2009, Dr. Nguyen ordered an urgent MRI for plaintiff's back injury.  On January 28, 2009, Dr. Rallos discussed plaintiff's case with Dr. Traquina, Chief Medical Officer, who is responsible for scheduling outside surgeries.  Defendants Austin and Mefford are also responsible for scheduling outside surgeries.  The January 28, 2009 MRI revealed plaintiff was suffering from spinal injury.  Dr. Rallos ordered an urgent consultation to neurosurgery.  Suzanne Silva, LVN, outside scheduling, issued an urgent notice to put plaintiff on Dr. Huffman's schedule for February 9, 2009.  On February 9, 2009, Dr. Huffman ordered x-rays of plaintiff's lumbar spine, and reviewed plaintiff's MRI report which "showed collapse of the disc space, dehydration of the intervertebral disc at L4-5, at L3-4, and loss of disc height at L2-3." (Dkt. No. 8 at 5.)  On the Forensic clinic follow-up consultation, Dr. Huffman found plaintiff was suffering from right lower extremity sciatica, limp, pain causing difficulty with ambulation, and sleep difficulty due to the pain, and weakness.  Plaintiff alleges defendant Huffman told plaintiff that he needed surgery, and that plaintiff agreed to the surgery.  (Id. at 6.) Plaintiff alleges that on many occasions between February and May 2009, he continued to complain to prison medical officials that he was in pain, and that he needed his back surgery. (Id.)  Plaintiff alleges he completed health care services request forms and 602 appeals to obtain back surgery due to his pain and suffering.  Plaintiff alleges defendants were responsible to timely schedule plaintiff's back surgery, and their delay in timely scheduling the back surgery amounts to deliberate indifference to plaintiff's serious medical needs.  (Id.)

III.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the grounds that there are no genuine issues of material facts, that plaintiff's claims are improperly based on theories of respondeat

1    superior and/or vicarious liability, and that defendants are entitled to qualified immunity; thus,

2    defendants contend they are entitled to judgment as a matter of law.  Plaintiff filed an opposition,

3    and defendants filed a reply.  (Dkt. Nos. 87, 88.)  On July 25, 2012, plaintiff was advised of the

4    requirements for filing an opposition to a motion for summary judgment under <u>Rand v. Rowland</u>,

5    154 F.3d 952, 957 (9th Cir. 1998), and granted an additional thirty days in which to file a

6    supplemental opposition.  (Dkt. No. 98.)  On August 17, 2012, plaintiff filed a response stating

7    he would rely on his original opposition.  (Dkt. No. 91.)  In his 212 page opposition, plaintiff

8    provided a declaration signed under penalty of perjury.  (Dkt. No. 87 at 33-37.)

9                        A.  <u>Legal Standard for Summary Judgment</u>

10                        Summary judgment is appropriate when it is demonstrated that the standard set

11   forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

12   the movant shows that there is no genuine dispute as to any material fact and the movant is

13   entitled to judgment as a matter of law. "  Fed. R. Civ. P. 56(a).[2]

14                    Under summary judgment practice, the moving party always bears
                      the initial responsibility of informing the district court of the basis
15                    for its motion, and identifying those portions of "the pleadings,
                      depositions, answers to interrogatories, and admissions on file,
16                    together with the affidavits, if any," which it believes demonstrate
                      the absence of a genuine issue of material fact.

17

18   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

19   56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

20   only prove that there is an absence of evidence to support the non-moving party's case."  <u>Nursing</u>

21   <u>Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)</u>, 627 F.3d 376,

22   387 (9th Cir. 2010) (citing <u>Celotex Corp.</u>, 477 U.S. at 325); <u>see</u> <u>also</u> Fed. R. Civ. P. 56 Advisory

23   Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

24

25            [2]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
      2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
26   56, "[t]he standard for granting summary judgment remains unchanged."

1 burden of production may rely on a showing that a party who does have the trial burden cannot

2 produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

3 should be entered, after adequate time for discovery and upon motion, against a party who fails to

4 make a showing sufficient to establish the existence of an element essential to that party's case,

5 and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

6 "[A] complete failure of proof concerning an essential element of the nonmoving party's case

7 necessarily renders all other facts immaterial."  Id. at 323.

8 　　　　Consequently, if the moving party meets its initial responsibility, the burden then

9 shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

10 See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

11 to establish the existence of such a factual dispute, the opposing party may not rely upon the

12 allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

13 form of affidavits, and/or admissible discovery material in support of its contention that such a

14 dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

15 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

16 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

17 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

18 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

19 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

20 1436 (9th Cir. 1987).

21 　　　　In the endeavor to establish the existence of a factual dispute, the opposing party

22 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

23 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

24 versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

25 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

26 ////

1  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

2  committee's note on 1963 amendments).

3       In resolving a summary judgment motion, the court examines the pleadings,

4  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

6  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

7  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

8  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

9  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

10  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

11  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12  show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

13  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

14  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

15       By orders filed May 31, 2011, and July 25, 2012, the court advised plaintiff of the

16  requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

17  Procedure.  (Dkt. Nos. 12, 89); see Rand, 154 F.3d at 957.

18       B.  Undisputed Facts

19       For purposes of the instant motion for summary judgment, the court finds the

20  following facts undisputed.

21       1.  Plaintiff was in the custody of the California Department of Corrections and

22  Rehabilitation ("CDCR") at California State Prison in Solano ("CSP-Solano") in 2009.

23       2.  Defendant Austin is the Chief Executive Officer of Health Care Services at

24  CSP-Solano.  She has worked for the California Department of Corrections and Rehabilitation

25  for approximately two and one half years.  (Ex. C to Appendix, Austin Decl. ¶2.)

26  ////

3.  As Chief Executive Officer of Health Care Services, defendant Austin works under the leadership of the Regional Administrator.  She is responsible for planning, organizing, and coordinating delivery of a multi-functional health care system.  The system features a full range of medical, mental health, dental, pharmacy and medication management, specialized care and clinic services, and allied health.  She serves as the Department's and the Medical Receiver's principal advisor on the institution's specific application of health care policies and procedures.  (Ex. B to Appendix, Austin Decl. ¶3.)

4.  Defendant Mefford is the Correctional Health Services Administrator II at CSP-Solano.  (Ex. B to Appendix, Mefford Decl. ¶2.)

5.  As the Correctional Health Services Administrator, defendant Mefford has supervisory authority over the ancillary service areas of the health care department, such as the laboratories, radiology department, and medical records.  Additionally, she supervises the administrative aspects of the health care department, such as departmental budgets, and inmate medical administrative grievances.  She has held this position for approximately six years.  (Ex. B to Appendix, Mefford Decl. ¶3.)

6.  Since March of 2003, defendant Dr. Traquina has served as the Chief Medical Officer ("CMO") at CSP-Solano.  Dr. Traquina received his medical license from the State of California in 1980, and is certified as a specialist by the American Board of Surgery.

7.  As the Chief Medical Officer, Dr. Traquina plans, organizes, and directs the medical, dental, psychiatric, and clinical services for the care and treatment of inmates housed at the prison; he plans and assigns work; supervises admissions, assigns cases to physicians, checks case histories and progress; examines, diagnoses, prescribes, and administers treatment; performs minor surgeries and supervises postoperative care of patients; diagnoses cases; prescribes medical and surgical treatment; directs the clinical and pathological work and orders examinations and analyses, x-rays, dental work, special diets, and medications; conducts staff conferences and in services training; exercises expenditure controls for equipment and

6

supplies; prepares the institution health care budget; develops and implements the long range

planning of health care programs; establishes and approves local health care policy and

procedure; and prepares comprehensive medical reports.

8.  On January 22, 2009, plaintiff submitted a CDC Form 7362, Request for

Health Care Services form, complaining of excruciating pain in his right leg.  (Ex. A to

Appendix, Traquina Decl. ¶5; Dkt. No. 87 at 49.)

9.  On January 23, 2009, plaintiff was issued a chrono for a lower bunk and to

have a wheelchair for two weeks.  (Dkt. No. 87 at 53.)  Dr. Traquina approved the chrono on

February 5, 2009.  (Id.)

10.  Plaintiff was examined by a Registered Nurse on January 25, 2009, who

reported that plaintiff was unable to ambulate due to leg and hip pain.  (Ex. A to Appendix,

Traquina Decl. ¶6.)

11.  Plaintiff completed another 7362 on January 26, 2009, complaining of pain in

his right leg for the past two weeks, which he ranked ten on a scale of one to ten.  (Ex. A to

Appendix, Traquina Decl. ¶7; Dkt. No. 87 at 55.)  Plaintiff had cramps and spasms, and was

unable to walk on the leg.

12.  On January 26, 2009, Dr. Noriega examined plaintiff, assessing muscle

spasms in the lower back and thigh, and prescribed an injection of Toradol and Robaxin.  (Dkt.

No. 87 at 64.)

13.  On January 28, 2009, plaintiff received an MRI of the lumbar spine and hip,

which revealed degenerative disc disease.  (Ex. A to Appendix, Traquina Decl. ¶8.)

14.  On January 28, 2009, plaintiff was issued a chrono for a ground floor cell and

crutches for one month, and a bottom bunk for six months.  (Dkt. No. 87 at 66.)  Dr. Traquina

approved this chrono on February 5, 2009.  (Id.)

15.  On January 29, 2009, treating Dr. Nguyen of CSP-Solano requested an urgent

referral for plaintiff to see an orthopedic surgeon, noted that he discussed plaintiff's case with Dr.

1 | Traquina on January 28, 2009, and also authorized surgery if the orthopedic surgeon

2 | recommended it.[3]  (Ex. A to Appendix, Traquina Decl. ¶9, Ex. D.)  Near the bottom of the

3 | Request for Services Form, follow-up is circled, and Dr. Nguyen wrote:  "for ? surgical planning

4 | after MRI.  *Please send Films."  (Id., Ex. D.)  Dr. Traquina declares that this notation indicates

5 | that surgery was authorized by the prison on January 29, 2009.  (Ex. A to Appendix, Traquina

6 | Decl. ¶9.)

7 |        16.  On January 29, 2009, Suzanne Silva, LVN, from CSP-Solano outside medical

8 | scheduling, faxed an urgent request for plaintiff to be seen by Dr. Huffman on February 9, 2009.

9 | (Id., Ex. E, Dkt. No. 1 at 38.)   The appointment with orthopedic surgeon Dr. Huffman was

10 | confirmed on February 3, 2009.  (Dkt. No. 1 at 45; Traquina Decl. ¶10.[4])

11 |        17.  On February 5, 2009, Dr. Traquina approved two "Comprehensive

12 | Accommodation Chronos" for plaintiff to receive lower bunk and ground floor housing, and

13 | access to a wheelchair and crutches.  (Dkt. No. 87 at 53, 66.)  The chrono form states that "[a]

14 | physician shall complete this form if an inmate requires an accommodation due to a medical

15 | condition."  (Id.)

16 |        18.  On February 8, 2009, a medical code was called on plaintiff.  (Dkt. No. 87 at

17 | 78.)  Plaintiff complained of pain from his lower back down to his toes, and acute spasms, and

18 | claimed he could not stand or walk.  He was assessed as having acute lower back pain and

19 | impaired mobility, and given an injection of 60 mg. of Toradol.  (Id.)

20 |        19.  Plaintiff was examined by Dr. Huffman on February 9, 2009, who

21 | recommended surgery if supported by the MRI findings.  Dr. Huffman noted that he

22 | needed the MRI to review.  (Ex. A to Appendix, Traquina Decl. ¶11.)

23 |

24 |        [3]  Plaintiff denies that this form authorized surgery, but cites to no other documentary

25 | evidence reflecting that surgery was authorized on a date other than January 29, 2009.

26 |        [4]  Although Dr. Traquina's declaration references Exhibit E, Exhibit E is the request that
was faxed, not confirmation that was faxed on February 3, 2009.

20.   In his written report, Dr. Huffman recorded plaintiff's present illness history as follows.  (Dkt. No. 87 at 80.)  Plaintiff hurt his back playing basketball.  After the injury, plaintiff experienced increasing pain on the right side of his back over the next 24 hour period, radiating into his thigh, leg and foot.  Plaintiff's pain was severe over the next two weeks, but then plaintiff received an injection of Toradol which helped somewhat.  Plaintiff is now managing the pain but still has significant pain, which causes difficulty in walking, and causes a limp.  Plaintiff cannot put weight on his right leg, and has difficulty sleeping.  Plaintiff's pain is relieved by sitting and resting and by medications, but is exacerbated by ambulating.  Motrin and Soma seemed to help.  Dr. Huffman's recommendations state:

> At this time, I would like to obtain the copies of the MRI films to review myself.  The patient appears to have L3-4 foraminal stenosis which I suspect would give more L3 nerve root symptoms and his symptoms actually present as more L4-K5 nerve root symptoms on examination and history.  If all the things are consistent, once I get a chance to personally review the MRI, I would consider decompression around the L4-L5 nerve roots.  I discussed this with the patient and he is interested in surgical intervention if that is the case.  At this time, my recommendation is to obtain the MRI.  If the MRI is consistent with the history and clinical examination, then proceed with surgical micro decompression.  If not, I will see the patient back for further examination.

(Dkt. No. 1 at 50.)

21.   On February 9, 2009, Dr. Nguyen approved a follow-up request for plaintiff to see Dr. Huffman regarding the collapse in his disc space.  Dr. Nguyen noted that plaintiff did not have his January 28, 2009 MRI films with him when he was treated by Dr. Huffman on February 9, 2009, and requested they be sent with plaintiff for the follow-up.  (Ex. A to Appendix, Traquina Decl. ¶13, Ex. G.)  Dr. Nguyen said plaintiff should have a follow-up appointment within 14 days.  (Id.)  The form was faxed to Dr. Huffman's office on February 9, 2009.  (Id.)

22.   On February 17, 2009, the radiologist's report from the CT scan of plaintiff's abdomen and pelvis noted:

1
2
3
4
5

> Marked degenerative disc changes at L2-3 and L3-4.  Moderate broad-based disc protrusion at L2-3 with some effacement of the ventral subarachnoid space.  Moderate broad-based protrusion of the disc at L3-4, which in association with hypertrophy of the ligaments flave bilaterally and hypertrophic changes within the facet joints bilaterally, results in a mild to moderate spinal stenosis. Both neural foraminal canals moderately narrowed at this level as well.  No significant disc disease at L4-5 or L5-S1.

6   (Dkt. No. 87 at 87.)  The radiologist concluded that plaintiff had "moderate lumbar spondylosis

7   at L2-3 and L3-4 . . . Spondylodiscitis at either of these two levels cannot be excluded."  (Id. at

8   88.)

9          23.  On February 26, 2009, during an examination for unrelated complaints, Dr.

10   Nguyen noted "please check f/u appointment with Dr. Huffman for surgery."  (Ex. A to

11   Appendix, Traquina Decl. ¶14.)

12          24.  On March 10, 2009, Renee with the Napa Valley Orthopedic Group sent a

13   request for surgical authorization, appending a copy of Dr. Huffman's consultation report, and

14   requested that prior to scheduling, a copy of the MRI film be sent to the forensic unit for review.

15   The bottom of the documents states "4/29 Dr. Huffman reviewed and surgery info for Tina."

16   (Ex. A to Appendix, Traquina Decl. ¶15.)[5]

17          25.  On March 15, 2009, plaintiff filed a 602 appeal noting his back injury, his

18   consultation with a spinal surgeon, and that he was awaiting surgery.  (Dkt. No. 87 at 92.)

19   Plaintiff stated that he "continue[s] to have back spasms and extreme pain in legs, and buttocks,

20   hip area," and that he could not put pressure on his right leg.  (Id.)  Plaintiff asked to be sent out

21   for surgery to be relieved of the extreme pain and discomfort.  (Id.)  On May 8, 2009, at the

22   second level of review, T. Brimhall, Health Care Manager, informed plaintiff that all the

23   paperwork was sent to Queen of the Valley Hospital as requested by Dr. Huffman, and "is

24   pending scheduling."  (Dkt. No. 87 at 96.)  The Outside Scheduling Office was contacted again

25

26          [5]  Plaintiff did not indicate whether or not he disputes this fact (dkt. no. 87 at 18-19); thus, the fact is deemed undisputed.

1    on May 6, 2009, and confirmed that plaintiff's surgery date was set for the month of May 2009.

2    (Id.)  None of the rulings on plaintiff's March 15, 2009 appeal bear any of the named defendants'

3    signatures.

4        26.  On March 19, 2009, plaintiff completed a 7362 and complained of extreme

5    pain in his right leg with numbness in his fingers.  Plaintiff inquired as to the surgery for his

6    back, and stated that the "pain medication is not really helping."  (Ex. A to Appendix, Traquina

7    Decl. ¶15; Dkt. No. 87 at 90.)  Plaintiff was seen by a Registered Nurse that day who contacted

8    the outside scheduling office, and was informed that plaintiff was one of the priority to go, and

9    the appointment may be next month.  (Ex. A to Appendix, Traquina Decl. ¶15.)

10       27.  On April 30, 2009, Tina from the Napa Valley Orthopaedic Group faxed an

11   outpatient scheduling form, noting plaintiff's May 11, 2009 appointment with Dr. Huffman, with

12   a surgery date of May 21, 2009.  (Id., Ex. K.)  The form also states that "patient didn't see

13   hospitalist this day, didn't have pre op testing with him.  Rescheduled to 5-19-09 at 1:00."  (Id.)

14       28.  On May 1, 2009, Dr. Huffman signed "Preadmission Surgery Orders," noting

15   the May 21, 2009 surgery date, and the May 11, 2009 pre-operative appointment, and ordering

16   certain pre-operative tests.  (Dkt. No. 1 at 87.)

17       29.  Dr. Huffman's surgery scheduling form is not signed or dated, but the surgery

18   is marked "elective," and described the surgery to be performed.  (Dkt. No. 1 at 75.)  The form

19   notes a pre-operative appointment for May 11, 2009, and surgery on May 21, 2009.  (Id.)  The

20   bottom of the form contains the following handwritten notes:

21           5-6 faxed prison.
             4-29-09 Renee said ok to schedule.
22           Dr. Reviewed MRI.   4/30 told Renee
             Seen 4-20-09 by hospitalist.  Faxed
23           Faxed 5-1

24   (Dkt. No. 1 at 75.)

25   ////

26   ////

11

1     30.  Surgery was subsequently scheduled for May 21, 2009.  Plaintiff was

2   scheduled to see Dr. Huffman for a preoperative visit on May 11, 2009.  (Ex. A to Appendix,

3   Traquina Decl. ¶16.)

4     31.  On May 5, 2009, Laura Mefford, R.N., and Dr. Traquina signed a Request for

5   Authorization for Temporary Removal for Medical Reasons to allow plaintiff to leave the prison

6   for the May 11, 2009 preoperative visit.[6]  (Ex. A to Appendix, Traquina Decl. ¶17, Ex. L; Dkt.

7   No. 87-1 at 81.)

8     32.  On May 11, 2009, Dr. Huffman examined plaintiff for the preoperative visit.

9   Dr. Huffman had reviewed the MRI and confirmed that surgery would be beneficial, and plaintiff

10   agreed.  (Ex. A to Appendix, Traquina Decl. ¶18.)

11     33.  On May 19, 2009, Dr. Rohrer signed a follow-up request for plaintiff to

12   undergo the surgical procedure.  (Ex. A to Appendix, Traquina Decl. ¶19.)

13     34.  On May 21, 2009, plaintiff was admitted to Queen of the Valley Hospital, and

14   micro decompression surgery was performed that day.  (Ex. A to Appendix, Traquina Decl. ¶20.)

15   Plaintiff's diagnosis was lumbar stenosis/sciatica.  (Id., Ex. O.)  Dr. Huffman performed a

16   hemilaminectomy/foraminotomy at L3-4 and L4-5.  (Dkt. No. 87-1 at 40.)

17     35.  Although the surgery was approved by prison staff in January 2009, the

18   surgery was not to be performed at the prison, and plaintiff had to be evaluated by Dr. Huffman

19   ////

20   ////

21

22       [6]  Plaintiff claims R.N. Mefford signed this form, apparently disputing whether Dr.
Traquina signed the form, and citing "Decl. of Mitchell Wrosch, Ex. M."  (Dkt. No. 87 at 19.)
23   Mitchell Wrosch is counsel for defendants.  The court was unable to locate a declaration by Mr.
Wrosch in plaintiff's 212 page filing.  (Dkt. No. 87.)  Mr. Wrosch provided a declaration in
24   support of defendants' motion, but does not refer to an Exhibit M.  (Dkt. No. 82-2 at 78-79.)
Defendants' exhibit M and plaintiff's exhibit M do not contain or refer to the May 5, 2009
25   request.  The copies of the May 5, 2009 request do not reflect a clear copy of Dr. Traquina's
signature, but Dr. Traquina declares he signed the request.  In any event, it is undisputed that
26   plaintiff was transported to the follow-up appointment.

1   on several occasions prior to undergoing surgery, and the normal administrative requirements

2   had to be met in the meantime.[7]  (Ex. A to Appendix, Traquina Decl. ¶23.)

3          36.  Dr. Traquina did not treat inmate plaintiff for his back pain.[8]  Additionally, he

4   did not participate in scheduling his back surgery.  Although he may have approved his surgery,

5   he did not determine the date that surgery would be performed. The Outside Scheduling Office

6   coordinates dates with the outside medical provider, and the scheduling of same is determined by

7   the availability of the outside medical provider. (Ex. A to Appendix, Traquina Decl. ¶24.)

8          37.  Dr. Traquina did not intend for inmate plaintiff to suffer unnecessary pain, or

9   to delay the scheduling of his back surgery any longer than was necessary.[9]  (Ex. A to Appendix,

10  Traquina Decl. ¶25.)

11         38.  Although she is a Registered Nurse, defendant Mefford has not worked

12  in this capacity since 2003.  At CSP-Solano, she has worked solely in an administrative capacity,

13  and does not provide direct medical care to inmates at the prison.  (Ex. B to Appendix, Mefford

14  Decl. ¶4.)

15         39.  Defendant Mefford does not participate in the direct medical treatment of

16  inmates generally, nor does she participate in the decision to refer inmates to outside medical

17  ////

18  ////

19         [7]  Plaintiff disputes this fact, claiming that the only reason Dr. Huffman did not perform

20  the surgery earlier was because Dr. Traquina failed to ensure that the MRI films were sent with
    plaintiff to the February 9, 2009 appointment with Dr. Huffman.  (Dkt. No. 87 at 21.)  However,

21  plaintiff cites to no evidence in support of this claim.

22         [8]  Plaintiff disputes this fact based on Dr. Traquina's approval of two chronos, alleging

23  these chronos linked Dr. Traquina to the scheduling and timeliness of the surgery, and that as
    CMO, Dr. Traquina is responsible for the delay in plaintiff's surgery.  (Dkt. No. 87 at 22.)

24         [9]  Plaintiff disputes this fact on the basis that Dr. Traquina was notified in January of

25  2009 that plaintiff's neurosurgeon needed the MRI films so that the surgery could be performed,
    that Dr. Traquina was aware that plaintiff's condition was urgent, and that plaintiff was in

26  extreme pain and needed to be scheduled for surgery.  (Dkt. No. 87 at 22.)  Plaintiff contends that
    the CMO is responsible for the treatment of plaintiff.  (Id.)

13

1   providers for examination or treatment.[10]  (Ex. B to Appendix, Mefford Decl. ¶5.)

2        40.   When a medical provider at the prison recommends an inmate for outside

3   services, the provider forwards the request to the Outside Scheduling Department, which then

4   coordinates the appointment with the outside medical provider, based upon the availability of the

5   outside provider.  The Outside Scheduling Department is located at the prison.  (Ex. B to

6   Appendix, Mefford Decl. ¶6.)

7        41.   Scheduling outside appointments can often involve coordinating with

8   multiple offices, including the outside provider, and in the case of surgery, with the hospital

9   where the surgery will take place.  (Ex. B to Appendix, Mefford Decl. ¶7.)

10       42.   If the outside provider requests that the inmate bring medical records

11  with him to the outside examination, it is the responsibility of the outside schedulers to prepare

12  these documents, and to forward them to the custody staff tasked with transporting the inmates.[11]

13  (Ex. B to Appendix, Mefford Decl. ¶8.)

14       43.   When an inmate is approved for outside medical services, a Request

15  for Authorization of Temporary Removal for Medical Reasons Form (CDC Form 7252) must be

16  completed.  The 7252 contains the inmate's personal information, the address of the outside

17  provider, the purpose of the outside treatment, and the reason why the service cannot be provided

18  at the prison.  (Ex. B to Appendix, Mefford Decl. ¶9.)

19       44.   As the Correctional Health Services Administrator, defendant Mefford

20  previously was responsible for reviewing and signing 7252s, which have already been completed

21  by the time they reach her desk.  Defendant Mefford's responsibility was to review the document

22

23       [10]  Plaintiff disputes this fact, stating that defendant Mefford "coordinates the treatment, [and] she is responsible for the release of inmates from the institution to be transported to the outside medical facility due to medical concerns.  (Dkt. No. 87 at 30.)  However, plaintiff cites to no evidence in the record to support his claim that defendant Mefford "coordinates" medical treatment.

24

25

26       [11]  Plaintiff contends that defendant Mefford was responsible to make sure that documents are transported with the inmates, without citation to evidence.  (Dkt. No. 87 at 25.)

to make sure the personal information of the inmate, as well as the outside provider, was entered correctly.  She did not review the inmate's medical records prior to completing a 7252, nor was she provided any information pertaining to the inmate's medical history.[12]  (Ex. B to Appendix, Mefford Decl. ¶10.)

45.  Defendant Mefford has never provided medical care to plaintiff, nor was she required to do so. (Ex. B to Appendix, Mefford Decl. ¶11.)

46.  Defendant Mefford did not participate in scheduling inmate plaintiff's May 2009 back surgery.  Her involvement was limited to signing the 7252, which authorized his temporary removal from the prison for the purposes of receiving outside medical care.  Defendant Mefford has never scheduled an inmate's surgery at CSP- Solano, whether it is to be performed at the prison or at an outside facility.[13]  (Ex. B to Appendix, Mefford Decl. ¶12.)

47.  Defendant Mefford has never seen or spoken to plaintiff.

48.  Defendant Austin is not a medical doctor, and she does not provide medical care to inmates at the prison.[14]  (Ex. B to Appendix, Austin Decl. ¶4.)

49.  Thus, defendant Austin does not participate in the treatment of inmates, nor does she participate in the decision to refer inmates to outside medical providers.[15]  (Id., ¶5.)

50.  When a medical professional at the prison determines that an inmate would benefit from treatment at an outside facility, the physician forwards a request for services to the prison's outside scheduling office, which then coordinates scheduling the appointment with the

[12]  Plaintiff disputes this fact, claiming defendant Mefford was responsible for reviewing plaintiff's medical history and records, without citation to evidence.  (Dkt. No. 87 at 26.)

[13]  Plaintiff claims that defendant Mefford "participated in the scheduling of [plaintiff's] May 2009 back surgery," (dkt. no. 87 at 26), without citing evidence.

[14]  Without citing to evidence, plaintiff claims that defendant Austin provides medical care to inmates at the prison (dkt. no. 87 at 28).

[15]  Plaintiff maintains that defendant Austin "participates in all the functions of treating inmates and the decision to refer inmates to outside medical providers," (dkt. no. 87 at 28), but cited to no evidence.

1  outside provider.  Defendant Austin does not work in the outside scheduling office, nor does she

2  schedule outside appointments for inmates.[16]  (Id., ¶6.)

3          51.  Defendant Austin did not schedule plaintiff's May 2009 back surgery, nor did

4  she participate in the decision as to when to schedule inmate plaintiff back surgery.  In fact, she

5  has never scheduled any inmate's surgery, either at the prison or at an outside medical facility.[17]

6  (Id., ¶7.)

7          52.  Defendant Austin has never provided medical care to plaintiff, nor has she

8  ever seen or spoken to him.  (Id., ¶8.)

9          53.  Plaintiff testified that the outside scheduling office at CSP-Solano is

10  responsible for scheduling inmates' appointments with outside medical providers.  (Ex. D to

11  Appendix, Pl.'s Depo. at 12:21-13:6.)

12          54.  Plaintiff testified that he filed several medical administrative appeals (CDC

13  Form 7362), and a general administrative appeal (CDC Form 602), but the defendants were not

14  the prison staff that responded to them.[18]  (Ex. D to Appendix, Pl.'s Depo. at 20:3-7.)

15          55.  Plaintiff never complained directly to Dr. Traquina, but Dr. Traquina was

16  notified on January 28, 2009, that plaintiff was being sent to an outside provider. (Ex. D to

17  Appendix, Pl.'s Depo. at 20:8-12.)

18  ////

19  ////

20  ////

21

22      [16]  Without citing to evidence, plaintiff claims that defendant Austin schedules outside
    appointments.  (Dkt. No. 87 at 28.)

23      [17]  Plaintiff claims that defendant Austin "participated in the scheduling of plaintiff's back
24  surgery."  (Dkt. No. 87 at 29.)  However, plaintiff cites to no evidence.

25      [18]  Plaintiff disputes this fact, stating that while defendants' names did not appear on any
    of the responses to the 602 forms, plaintiff believes that defendants participated in the decision-
    making process in resolving the 602 appeal.  (Dkt. No. 87 at 30.)  However, plaintiff cites to no
26  evidence in the record that supports this belief.

56. Besides the January 28, 2009 record that mentions Dr. Traquina, plaintiff does not have any other medical records that refer to defendants.[19]  (Ex. D to Appendix, Pl.'s Depo. at 21:13-25.)

57. Plaintiff has seen Dr. Traquina before, but he has never seen defendants Austin or Mefford.  (Ex. D to Appendix, Pl.'s Depo. at 22:1-7.)

58. Plaintiff sued defendant Mefford because defendant Mefford signed the authorization that permitted him to leave the prison to see an outside medical provider.[20]  (Ex. D to Appendix, Pl.'s Depo. at 22:11-23:1.)

59. Defendant Austin does not appear in any of plaintiff's medical records, and she is being sued because she is CEO of Health Care and is "in charge."[21]  (Ex. D to Appendix, Pl.'s Depo. at 24:10-25.)

60. None of the defendants personally treated plaintiff for his back pain prior to the May 2009 surgery.[22]  (Ex. D to Appendix, Pl.'s Depo. at 28:9-29:2.)

61. Plaintiff sued defendants Mefford and Austin because they are prison administrators.[23]  (Ex. D to Appendix, Pl.'s Depo. at 21:13-22:7.)

////

////

---

[19]  Plaintiff claims he has other medical records that mention defendants, but he does not cite to an exhibit number or otherwise identify those documents.  (Dkt. No. 87 at 30.)

[20]  Without citation to evidence, plaintiff now claims he also sued defendant Mefford because "she participated in scheduling his back surgery."  (Dkt. No. 87 at 31.)

[21]  Without citing to evidence, plaintiff now claims he also sued defendant Austin because "she participated in scheduling his back surgery."  (Dkt. No. 87 at 31.)

[22]  Plaintiff agrees that Dr. Traquina approved two chronos in January 2009 and February 2009, but provided no evidence that Dr. Traquina personally or medically treated plaintiff for pain prior to the May 2009 back surgery.

[23]  Plaintiff now claims that he also sued defendants Mefford and Austin because they participated in scheduling plaintiff's back surgery (dkt. no. 87 at 32), but does not cite to any evidence in support thereof.

62.  Plaintiff sued defendant Austin because she is CEO, and "in charge."[24]  (Ex. D to Appendix, Pl.'s Depo. at 24:17-25.)

63.  In response to an interrogatory asking how outside surgeries are scheduled at the prison, plaintiff responded he does not know.  (Ex. F to Appendix, Supplemental Responses to Defendant Austin's First Set of Interrogatories.)

C.  <u>Legal Standards</u>

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  <u>See Monell v. Department of Social Servs.</u>, 436 U.S. 658, 692 (1978) ("Congress did not intend § 1983 liability to attach where . . . causation [is] absent."); <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976) (no affirmative link between the incidents of police misconduct and the adoption of any plan or policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of <u>respondeat superior</u> and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed

---

[24]  Plaintiff now claims that he also sued defendant Austin because she "participated in scheduling plaintiff's back surgery."  (Dkt. No. 87 at 32.)  Plaintiff does not cite to evidence supporting this claim.

1   constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

2   (9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v.

3   Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979) (no liability where

4   there is no evidence of personal participation).  Vague and conclusory allegations concerning the

5   involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board

6   of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of

7   personal participation is insufficient).

8          Generally, deliberate indifference to a serious medical need presents a cognizable

9   claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

10  punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511

11  U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison

12  official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that

13  risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is

14  less stringent in cases involving a prisoner's medical needs than in other cases involving harm to

15  incarcerated individuals because 'the State's responsibility to provide inmates with medical care

16  ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974

17  F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled

18  on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

19  Specifically, a determination of "deliberate indifference" involves two elements:  (1) the

20  seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

21  those needs.  McGuckin, 974 F.2d at 1059.

22         First, a "serious" medical need exists if the failure to treat a prisoner's condition

23  could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id.

24  (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

25  medical attention include the existence of an injury that a reasonable doctor or patient would find

26  important and worthy of comment or treatment; the presence of a medical condition that

1  significantly affects an individual's daily activities; or the existence of chronic and substantial

2  pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

3  (9th Cir. 1990)).

4           Second, the nature of a defendant's responses must be such that the defendant

5  purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

6  "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

7  indifference may occur when prison officials deny, delay, or intentionally interfere with medical

8  treatment, or may be shown by the way in which prison physicians provide medical care."

9  Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

10  indifference to be established, there must first be a purposeful act or failure to act on the part of

11  the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

12  purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

13  deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the

14  defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

15  further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

16          Mere differences of opinion concerning the appropriate treatment cannot be the

17  basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

18  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to

19  treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v.

20  City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious

21  medical condition, even if some treatment is prescribed, may constitute deliberate indifference in

22  a particular case.  Id.

23          In order to defeat the motion for summary judgment, plaintiff must "produce at

24  least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630,

25  that defendants' actions, or failures to act, were "in conscious disregard of an excessive risk to

26  plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

1        D. <u>Analysis</u>

2            i. <u>Defendant L. Austin</u>

3            In his deposition, plaintiff claimed that he sued defendant Austin, Chief Executive

4    Officer ("CEO"), because she is a prison administrator and is "in charge."  Plaintiff now claims

5    that defendant Austin participated in scheduling plaintiff's back surgery.  In his opposition,

6    plaintiff claims that defendant Austin was "notified of plaintiff's urgent medical condition," and

7    that defendants "were aware of plaintiff's complaints of extreme pain and suffering, and the need

8    to have urgent surgery to relieve the pain and suffering he was experiencing."  (Dkt. No. 87 at 9.)

9            "Liability under [§ ] 1983 arises only upon a showing of personal participation by

10   the defendant.  A supervisor is only liable for the constitutional violations of . . . subordinates if

11   the supervisor participated in or directed the violations, or knew of the violations and failed to act

12   to prevent them.  There is no respondeat superior liability under [§ ] 1983." <u>Taylor v. List</u>, 880

13   F.2d 1040, 1045 (9th Cir. 1989) (citations omitted).

14           Here, it is undisputed that defendant Austin does not appear in any of plaintiff's

15   medical records, and did not personally respond to plaintiff's administrative appeals or health

16   care services request forms.  In her response to interrogatory no. 7, defendant Austin stated that

17   she does not approve or schedule surgeries at outside hospitals.  (Dkt. No. 81 at 73.)  Defendant

18   Austin confirmed that all requests for services go through the Interqual System, not the CEO.

19   (Id. at 75)  Plaintiff adduced no competent evidence to rebut defendant Austin's evidence that

20   she did not medically treat plaintiff, and that she was not involved in approving or scheduling

21   plaintiff's surgery.[25]

22

23           [25]  In his reply to defendants' opposition to plaintiff's motion for summary judgment,
     plaintiff stated that he "believes that defendant Austin is responsible for coordinating treatment
     of plaintiff with outside providers," citing "Exhibit A Memorandums."  (Dkt. No. 86 at 4.)  One
24   of the memorandums he provided, dated May 10, 2010, was signed by Alice LaVergne,
     Administrative Assistant, Office of the CEO Lori Austin.  (Dkt. No. 86 at 11.)  The 2010 memo
25   does not identify the nature of the delayed surgery, but the surgery at issue in this action took
     place on May 21, 2009.  Moreover, the 2010 memo does not indicate that defendant Austin is
26   responsible for coordinating medical treatment; rather, the memo was a response to plaintiff's

1    Thus, defendant Austin's role as CEO, without more, is insufficient to

2  demonstrate liability in this action.  Plaintiff does not offer any evidence to suggest that

3  defendant Austin engaged in any specific acts that violated plaintiff's constitutional rights or

4  failed to investigate any of her employees' acts that may have violated plaintiff's constitutional

5  rights.  Rather, plaintiff's claims appear to stem from his belief that defendant Austin is liable as

6  a supervisor.  Defendant Austin attests to the fact that she was not involved in plaintiff's medical

7  treatment, and did not participate in the scheduling of plaintiff's surgery.  (Dkt. No. 82-2 at 5.)

8    Therefore, the court recommends that summary judgment be granted in favor of

9  defendant Austin due to her lack of personal participation in plaintiff's alleged constitutional

10  violations.

11    ii.  Defendant L. Mefford

12    Plaintiff argues that "defendants were medical officials responsible for timely

13  scheduling, approving, and authorizing plaintiff's back surgery."  (Dkt. No. 87 at 3.)

14  Specifically, plaintiff contends that defendant Mefford is linked to plaintiff's treatment because

15  she signed the 7252 form regarding plaintiff's urgent need for back surgery.  (Dkt. No. 86 at 5.)

16  However, defendant Mefford's May 12, 2009 signature on the 7252 form is the only fact

17  establishing a connection to plaintiff.

18    Defendant Mefford adduced evidence that her sole responsibility in signing 7252

19  forms is to review the document to make sure the personal information of the inmate, as well as

20  the outside provider, was entered correctly.  Defendant Mefford declares that she does not

21  provide medical treatment to inmates, she does not schedule surgeries, and that prior to

22  completing the 7252 forms, she does not review inmates' medical histories, and she is not

23

24  letter regarding the surgery that was delayed in 2010.  (Dkt. No. 86 at 11.)  The memo confirmed
that plaintiff was scheduled for surgery within the next 60 days.  (Id.)  Accordingly, this

25  documentary evidence does not support plaintiff's allegations concerning the alleged
involvement of defendant Austin in the delay in scheduling plaintiff's May 21, 2009 back

26  surgery.

provided an inmate's medical history.  Plaintiff failed to rebut Mefford's declaration with

competent evidence.  Plaintiff adduced no evidence demonstrating that defendant Mefford was

responsible for scheduling, approving, or authorizing plaintiff's surgery, or that defendant

Mefford was responsible for any delay in scheduling the surgery.  Indeed, there is no evidence

that defendant Mefford was responsible for signing a 7252 form prior to May 12, 2009, or that

defendant Mefford was aware of any delay in the scheduling of plaintiff's surgery.

Plaintiff adduced no evidence demonstrating that defendant Mefford was

responsible for sending MRI films to Dr. Huffman for the February 2009 appointment.

Moreover, by signing the 7252 form on May 12, 2009, defendant Mefford

authorized plaintiff's release from the prison for pre-operative care.  Thus, her sole action in this

case assisted plaintiff in obtaining back surgery.  Such action, without more, cannot be construed

as deliberate indifference.

Plaintiff offers no evidence suggesting that defendant Mefford engaged in any

specific acts that violated plaintiff's constitutional rights.  Thus, defendant Mefford is entitled to

summary judgment.

iii.  Defendant Dr. Traquina

The record evidence reflects that Dr. Nguyen discussed plaintiff's case with Dr.

Traquina on January 28, 2009, and on January 28, 2009, plaintiff received an MRI.  On January

29, 2009, Dr. Nguyen issued an urgent referral for plaintiff to be seen by Dr. Huffman, the

outside orthopedic surgeon, and an urgent request for an appointment was faxed on the same day.

On February 5, 2009, Dr. Traquina approved two chronos for plaintiff to receive lower bunk

housing and access to a wheelchair and crutches.  (Dkt. No. 87 at 53, 66.)  On February 8, 2009,

when plaintiff presented with acute lower back pain, plaintiff was provided an injection of 60

mg. of Toradol for pain.  On February 9, 2009, plaintiff was seen by Dr. Huffman.  During the

February 9, 2009 appointment with Dr. Huffman, plaintiff reported that plaintiff's pain:

////

was severe for about 2 weeks and then he got some medications for it including a Toradol injection which helped somewhat and he is now managing the pain but he still has significant pain.  His pain is causing him difficulty with ambulation, causing him to limp.  He has a hard time weightbearing on the right leg because it increases his pain and it is making him difficult to sleep.  The pain is relieved by sitting and resting and by the medications.  It is made worse by ambulating.  He has been taking Motrin, Soma and Tylenol 3.  The Motrin and Soma seemed to help so he stopped taking the Tylenol 3 because it wasn't really helping.

(Dkt. No. 87 at 80.)  It is undisputed that plaintiff's January 28, 2009 MRI films were not transported with plaintiff for the February 9, 2009 appointment.

Plaintiff argues that defendants "refused to send plaintiff's MRI films to the neurosurgeon to review, causing the delay."  (Dkt. No. 87 at 11.)  Although plaintiff's MRI films were not transported with plaintiff to the February 9, 2009 appointment, plaintiff adduced no evidence demonstrating that Dr. Traquina was responsible for making sure plaintiff was accompanied by the MRI films, or that Dr. Traquina refused to send the MRI films with plaintiff to the appointment.  Indeed, plaintiff adduced no evidence demonstrating Dr. Traquina's personal involvement beyond the January 28, 2009 discussion and the February 5, 2009 approvals of the chronos.  Moreover, plaintiff failed to identify, by competent evidence, the person responsible for ensuring that plaintiff's MRI films accompanied plaintiff to his February 2009 appointment with Dr. Huffman.[26]

---

[26] Similarly, plaintiff failed to adduce evidence demonstrating that the person who allegedly failed to send the MRI films with plaintiff on February 9, 2012 acted with a culpable state of mind.  If the person simply forgot to follow-up or was negligent in his or her job duties, such failure would not rise to the level of a constitutional violation.  Isolated occurrences of neglect do not constitute deliberate indifference to serious medical needs.  See Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) ("If the harm is an 'isolated exception' to the defendant's 'overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate indifference."); McGuckin, 974 F.2d at 1060; O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990).  Moreover, here, Dr. Traquina declared that in his professional opinion, there was no abnormal or excessive delay between the time plaintiff was approved for surgery on January 29, 2009, and May 21, 2009, the day surgery was performed.  (Dkt. No. 82-2 at 16.)  In addition, Dr. Huffman declared that plaintiff's surgery occurred "more rapidly than most surgeries performed on [CSP-Solano] inmates," and the elective surgery was "authorized, scheduled, and occurred more rapidly than similar surgeries on many non-inmate patients who have private insurance."

1    Plaintiff appears to argue that the accommodation chronos demonstrate that Dr.

2    Traquina treated plaintiff for his pain.  However, these chronos addressed housing, and provided

3    access to a wheelchair and crutches, and are unrelated to plaintiff's back surgery.  The chronos

4    do not indicate that they were issued based on plaintiff's complaints of pain, but rather

5    accommodated plaintiff's issues with mobility.  Also, Dr. Traquina did not issue the chronos;

6    rather, he simply approved them.  In addition, the approval of these chronos does not evidence

7    deliberate indifference; rather, the chronos demonstrate appropriate conduct on the part of Dr.

8    Traquina.  Thus, these chronos do not support plaintiff's allegation that Dr. Traquina

9    intentionally delayed plaintiff's surgery, or that Dr. Traquina was deliberately indifferent to

10   plaintiff's serious medical needs.

11    Plaintiff also argues that Dr. Traquina was aware that plaintiff's condition was

12   urgent, and that plaintiff was in extreme pain and needed to be scheduled for surgery.  However,

13   the record demonstrates that to the extent Dr. Traquina was personally involved, Dr. Traquina did

14   not fail to respond or intentionally delay plaintiff's surgery.  Rather, the record reflects that once

15   Dr. Traquina discussed plaintiff's case with Dr. Nguyen, plaintiff was provided an MRI on the

16   same day, and received an urgent referral to an orthopedic surgeon.  Dr. Traquina appropriately

17   approved two accommodation chronos to address plaintiff's serious mobility issues.  Dr.

18   Traquina declares that he approved plaintiff's surgery on January 29, 2009, subject to Dr.

19   Huffman's belief that surgery was appropriate.  Plaintiff adduced no evidence demonstrating that

20   Dr. Traquina was personally involved in plaintiff's medical care, or in scheduling plaintiff's

21   surgery, after February 5, 2009.  When plaintiff presented in acute pain on February 8, 2009, he

22   was provided with pain medication by injection, and Dr. Huffman's medical report reflects that

23   on February 9, 2009, plaintiff was managing his pain.  Thus, plaintiff failed to demonstrate that

24   Dr. Traquina was aware that plaintiff was suffering extreme pain due to an alleged delay in

25

26   (Dkt. No. 87-1 at 40-41.)

1  scheduling plaintiff's surgery, or that Dr. Traquina was deliberately indifferent to such pain.

2          Moreover, defendants adduced evidence that Dr. Traquina was not involved in

3  scheduling plaintiff's back surgery, and did not determine the date surgery was to be performed.

4  (Dkt. No. 82-2 at 17.)  Plaintiff failed to rebut such evidence with competent evidence.

5          Plaintiff also alleges that defendant Traquina was aware that plaintiff needed

6  surgery to alleviate his severe pain by virtue of the administrative appeals and health care service

7  request forms that plaintiff submitted.  However, plaintiff failed to adduce evidence

8  demonstrating that Dr. Traquina was responsible for responding to these appeals and requests.

9  Absent such link or connection, plaintiff cannot demonstrate liability on the part of Dr. Traquina.

10  Plaintiff adduced no evidence demonstrating that Dr. Traquina was personally involved in

11  plaintiff's treating plaintiff's back injury or complaints of pain, or in addressing administrative

12  concerns about plaintiff's medical care, after the February 5, 2009 approval of the chronos.[27]

13  Defendant Traquina's role as Chief Medical Officer, without more, cannot demonstrate

14  deliberate indifference.

15          Finally, plaintiff contends that his need for surgery was "urgent."  However,

16  plaintiff provided no evidentiary support for this claim.  Dr. Nguyen sought an urgent referral for

17  plaintiff to see Dr. Huffman.  However, plaintiff presented no medical records demonstrating that

18  Dr. Huffman ordered plaintiff to have surgery on an urgent basis.  On Dr. Huffman's surgery

19  scheduling form, he marked the elective choice, and did not mark emergency or urgent.  (Dkt.

20  No. 1 at 75.)  Also, Dr. Huffman provided a declaration stating that the surgery was elective.

21

22          [27]  In his reply to defendants' opposition to plaintiff's motion for summary judgment,
   plaintiff cites to Dr. Traquina's April 27, 2010 memorandum in support of plaintiff's claim that

23  Dr. Traquina participated in delaying plaintiff's surgery.  (Dkt. No. 86 at 6, 10.)  However, this
   memo responded to plaintiff's request for an "interview/letter" dated April 22, 2010, and Dr.

24  Traquina's response confirmed that plaintiff was scheduled for an unspecified procedure on or
   around "next month May 2010."  (Dkt. No. 86 at 10.)  Moreover, this memorandum post-dates

25  the surgery at issue in this proceeding by about a year; plaintiff's back surgery took place on May
   21, 2009.  Thus, the April 27, 2010 memorandum offers no support for plaintiff's allegations

26  concerning a delay in scheduling plaintiff's May 21, 2009 back surgery.

1  (Dkt. No. 87-1 at 40.)  Thus, plaintiff's view that the surgery was urgent appears to be a

2  difference of opinion from that of Dr. Huffman, the treating orthopedic surgeon.  It is well

3  established that mere differences of opinion concerning the appropriate treatment cannot be the

4  basis of an Eighth Amendment violation.  <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996);

5  <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981).  While plaintiff subjectively believed

6  he should have had surgery sooner, there is no evidence in the record, viewed objectively, that

7  plaintiff required surgery on an urgent basis.

8         For all of the above reasons, defendant Dr. Traquina is entitled to summary

9  judgment.

10  **IV.  Qualified Immunity**

11        Alternatively, defendants contend they are entitled to qualified immunity.

12  Because plaintiff's Eighth Amendment claims against defendants lack merit, the court need not

13  reach the defense of qualified immunity.

14  **V.  Plaintiff's Motion for Summary Judgment**

15        Because no triable issue of material fact exists as to whether defendants Traquina,

16  Austin and Mefford violated plaintiff's Eighth Amendment rights by delaying plaintiff's back

17  surgery, plaintiff's motion for summary judgment should be denied.

18  **VI.  Plaintiff's Motion for Expert Witness**

19        On June 29, 2012, plaintiff filed a motion seeking the appointment of a neutral

20  expert witness by the court.  (Dkt. No. 84.)  However, because plaintiff failed to adduce evidence

21  demonstrating defendants' personal involvement in any alleged delay in scheduling plaintiff's

22  surgery, expert testimony would not change the outcome.  Thus, plaintiff's motion is denied.

23  **VII.  Conclusion**

24        Accordingly, IT IS HEREBY ORDERED that plaintiff's June 29, 2012 motion

25  (dkt. no. 84) is denied; and

26  ////

IT IS RECOMMENDED that:

1.  Defendants' June 27, 2012 motion for summary judgment (dkt. no. 82) be granted;

2.  Plaintiff's June 7, 2012 motion for summary judgment (dkt. no. 81) be denied; and

3.  This action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  November 16, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

will0638.msj